UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| TIFFIENY PRINCE | CIVIL ACTION NO. 04-1956 |
| VS. | |
| JO ANNE BARNHART, Commissioner<br>Social Security Administration | MAGISTRATE JUDGE METHVIN<br>BY CONSENT OF THE PARTIES |

## MEMORANDUM RULING

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the court concludes that there is no substantial evidence to support the ALJ's finding that Prince is not disabled. Accordingly, the Commissioner's decision is **REVERSED**.

### *Background*

Born on January 14, 1972, Tiffieny Prince ("Prince") is a 33 year-old claimant with a high school education. Prince worked in the past as a seamstress and cashier. On June 25, 2001, Prince protectively applied for supplemental security income alleging disability since January 1, 2001 due to diabetes mellitus, weight loss, blurred vision, and depression. Prince's application was denied on initial review, and an administrative hearing was held on May 5, 2003.[1] In an opinion dated October 28, 2003, the ALJ determined that Prince is not disabled because she is able to perform medium-level work which exists in sufficient numbers in the local and national economies.[2] The Appeals Council denied review and Prince timely filed this appeal.

---

[1] Tr. 19-49.

[2] Tr. 11-17.

2

*Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

*Procedure for Analysis of Impairments and the ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The procedure can be summarized as follows:

1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004),[3] citing 20 C.F.R. §404.1520a(b)(1).

2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(b)(2). To perform this latter step, the ALJ should assess the claimant's degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. Serrano-Diaz v.

---

[3] The undersigned was unable to find any Fifth Circuit cases setting forth the proper procedure for analyzing mental disability claims since the revisions and amendments to 20 C.F.R. §404.1520a in 2000. The revisions and amendments became effective on September 20, 2000. 65 Fed. Reg. 50,746 (August 21, 2000). See Boyd v. Apfel, 239 F.3d 698, 705 n.11 (5th Cir. 2001). The Serrano-Diaz decision is therefore cited as the most succinct summary of the current law that the undersigned was able to find during research for this report and recommendation.

Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(2) (2002).

4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(3) (2002).

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities*. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1). In the Fifth Circuit, courts adhere to the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5th Cir.1985) in assessing the severity of an impairment. In Stone, the Fifth Circuit declared that severity of an impairment must always be determined with regard to an individual's *ability to perform substantial gainful employment,* and cannot be based on medical severity alone. Moreover, the Fifth Circuit articulated the correct severity standard as follows:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.

Stone, 752 F.2d at 1101. The court further stated that "[W]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless

the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Id. at 1106.

In the instant case, the ALJ determined that Prince has the following severe impairments: insulin-dependent diabetes mellitus, decreased visual acuity, and depressive disorder.[4] The ALJ assessed Prince's residual functional capacity ("RFC") and concluded that she could perform medium level work with limitations on her ability to climb, operate hazardous machinery, drive, and work at unprotected heights. Relying on the testimony of a vocational expert, the ALJ concluded that there are jobs in the local and national economy which Prince can perform, and therefore, she is not disabled.

### *Assignment of Errors*

Prince alleges the following errors: 1) the Appeals Council failed to follow its own internal procedures by failing to properly consider Prince's brief; 2) the ALJ erred at Steps 2 and 3 in determining the severity of all of Prince's impairments; 3) the ALJ erred in assessing Prince's residual functional capacity, resulting in an improper reliance upon the vocational expert's testimony given in response to defective hypothetical questions.

### *Medical History*

Prince has a history of insulin dependent diabetes mellitus, chronic vomiting and nausea, vision problems, and depression.

---

[4] Tr. 14.

Beginning in January, 2001, Prince had repeated emergency room visits and hospitalizations for chronic nausea and vomiting, and occasional diarrhea.[5] On February 28, 2001, Prince was admitted into University Medical Center ("UMC") with complaints of a 50 pound weight loss, a two-month history of nausea and vomiting, diffuse abdominal pain and sharp chest pain.[6] Prince was hospitalized for three days and discharged with a diagnosis of intractable vomiting, gastroparesis[7], hyperglycemia[8], and insulin dependent diabetes mellitus.[9] Prince was discharged with dietary instructions and medication. On March 24, 2001, Prince was hospitalized again at UMC for two days for nausea, vomiting, and dehydration.[10]

In June, 2001, Prince was hospitalized at Chabert Medical Center due to weight loss.[11] The Discharge Summary states:

> The patient was admitted for weight loss. The patient was counseled with psychiatry. The patient was diagnosed with depression by psychiatry. During the hospital course, the patient had an upper GI series with small bowel follow through which was normal. Dietary was consulted. Her ANA was normal. She was put on antidepressant medications.[12]

---

[5] Tr. 138-139, 255.

[6] Tr. 214-215.

[7] Gastroparesis means paralysis of the stomach. The most common cause of gastroparesis is diabetes mellitus. *See* http://www.medicinenet.com/gastroparesis/article.htm

[8] Hyperglycemia is high glucose in the blood, which is diabetes mellitus. *See* http://www.medicinenet.com/diabetes_mellitus/article.htm

[9] Tr. 215.

[10] Tr. 193.

[11] Tr. 276-277.

[12] Tr. 277.

On June 27, 2001, Prince was seen at Tyler Mental Health Center, where she was diagnosed with major depression, single episode psychosis.[13] It was noted that Prince's mother died in September, 2000, her husband left her after 4-6 months of marriage, and she had an eviction pending.[14] Her sleep was disturbed and appetite was not good. It was recommended that Prince undergo individual therapy and continue medication. In March, 2002, Prince began monthly group therapy sessions at Tyler, which she was still attending at the time of the administrative hearing.

On October 30, 2001, Prince underwent cataract surgery with lens implant on her right eye.[15] She had a similar procedure performed on her left eye on January 18, 2002.[16] On May 6, 2003, was examined at Chalbert Ophthalmology Clinic complaining of a "sticking" pain in her right eye.[17] Upon examination, it was found that there was an exposed suture that was causing the pain. The suture was removed.

On November 2, 2002, Prince was admitted into Our Lady of Lourdes Hospital for nausea and vomiting.[18] Prince was dehydrated and was given IV fluids and potassium She underwent an upper endoscopic exam "and was found to have severe Grade 4 ulcerative esophaitis probably secondary to diabetic gastroparesis and reflux." Prince was given Protonix[19] to prohibit the

---

[13] Tr. 295.

[14] Tr. 292.

[15] Tr. 272-273.

[16] Tr. 334-339.

[17] Tr. 411.

[18] Tr. 359-365.

[19] *See* http://www.medicinenet.com/pantoprazole/article.htm

production of acid in the stomach and Reglan which strengthens the muscle tone of the lower esophagus sphincter.[20]

On November 27, 2002 and March 14, 2003, Prince was examined at UMC, complaining of numbness in both feet.[21] She was diganosed with diabetic neuropathy.

### *DDS Examinations*

On December 21, 2001, at the request of Disability Determination Services ("DDS"), Prince was examined by T. W. H. deBlanc, an internist.[22] Dr. deBlanc diagnosed, "diabetes, blurred vision, depression, nerves, abdominal pain, nausea, and vomiting." He noted that Prince complained of sticking pain in her feet and hands that are worse at night, which is consistent with diabetic neuropathy. He noted that she had cataracts in both eyes and right eye lens implant, with left eye lens implant scheduled for January, 2002. Dr. deBlanc's conclusions were based solely on his physical examination because DDS had sent the medical records of a different claimant, and thus, he did not have any medical information on which to base his opinion.

On January 29, 2002, Prince was examined by Dr. Alfred Buxton, a clinical psychologist.[23] Dr. Buxton noted that Prince's ability to attend and concentrate is good, pace is even, and intellect is dull normal or low average. Dr. Buxton noted Prince's physical complaints. He concluded:

> Clinically she would present with Bereavement (DSM-IV, V62.82); Partner Relational Problem (DSM-IV, V61.10) with degree of impairment severe and

---

[20] *See* http://www.medicinenet.com/metoclopramide/article.htm

[21] Tr. 376, 374.

[22] Tr. 282-286.

[23] Tr. 297-300.

prognosis poor; Poor Psychophysiological Response to Stress (DSM-IV, 316.00) with degree of impairment moderate and prognosis fair; and Dysthymic Disorder (DSM-IV, 300.40) with degree of impairment moderate and prognosis fair. . . Continued outpatient mental health intervention certainly would seem to be appropriate. Additionally, some grief counseling may be of benefit. Continued medical monitoring and management of her diabetes and her cataracts would also seem to be appropriate. If, and when, she shows significant improvement in her overall functional status, emotive and physiologic alike, as demonstrated through feedback from treating professionals and interventionists, then a referral to Louisiana Rehabilitation Service for assessment, training, and job placement would be appropriate. Any such referral prior to her demonstrating such significant lasting positive improvement would be premature.[24]

On February 26, 2002, a DDS non-examining physician completed a Mental Residual Functional Capacity Assessment for Prince.[25] It indicated that Prince had moderate limitations in her ability to understand and remember detailed instruction and maintain attention, and that she could perform work with simple routines and procedures.

On March 6, 2002, Prince was examined by Dr. Robert A. Holloway, an ophthalmologist.[26] Prince's eyesight was 20/100 in the right and 20/80 in the left with glasses, however, Dr. Holloway did not think the test results were valid. Dr. Holloway noted, "True vision not known. No pathology seen to correlate with vision or visual fields."[27]

### Administrative Hearing

At the administrative hearing, Prince testified about her problems:

Q. Could you just tell us in your own words what kind of problems you're having – medical problems and symptoms that you're having?

---

[24] Tr. 299.

[25] Tr. 306-309.

[26] Tr. 301-304.

[27] Tr. 301.

A. Well, I think I have – I think they call it neuropathy in my feet and hands. They swell. My hands tend to give out on me at times. My eyesight is like everything is just blurry – blurred vision. My stomach, I – half the time I'm, you know, bent over in pain. I get nauseated a lot – throw up. There's just at times I cry a lot. I don't know why, and it's like I can't – you know, seem to stay focused on something. And I suffer with diarrhea a lot.[28]

Prince also testified that she cannot lift more than 10-15 pounds because her hands give out on her and she can stand for only twenty minutes.[29] Also, she can sit, but when she does so, her feet must be elevated.

The vocational expert, Thomas Lafosse, testified regarding the availability of jobs which Prince could perform:

Q. Okay. For all hypotheticals, [inaudible] hypothetical person is the same age, education, and past relevant work as Ms. Prince. The first hypothetical is medium. The non-exertional limitations are no driving. No operating hazardous machinery. No climbing. No working at heights and simple one, two, three step tasks, and no excessive job stress. Could that person do the past relevant work of the claimant?

A. That person could perform the job of care-giver or companion. Sewing machine operator – no. I'm sorry. Strike that. Hazardous machinery involved there, and job of cashier. Also store laborer.

Q. All right. To be cautious, are there other jobs in the regional or national economy that fit the parameters of the hypothetical?

A. Yes, ma'am.

Q. Could you identify those?

\* \* \*

A. Medium – medium and below. First example would be hand packager or packager...

\* \* \*

---

[28] Tr. 29.

[29] Tr. 30.

A. Next example would be crate stocker, material handler. . .

\* \* \*

A. Next example would be greater or sorter. . .[30]

Mr. Lafosse testified that these same jobs would be available to someone with the additional limitations of mild restrictions in activities of daily living, social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. The ALJ defined moderate as meaning, "limitation in the area, but the individual is still able to function satisfactorily."[31]

The vocational expert testified that a person who suffered from nausea and/or abdominal pain every couple of weeks would have serious problems maintaining employment:

> Q. And then finally where an individual had nausea and/or abdominal pain in such a severe level that, again, it would prevent her from staying on task or prevent her from maintaining attention and concentration – while this is episodic and it may not happen let's say more than once every couple of weeks, when it does, it's for fairly protracted period that might actually end up resulting in an individual having to leave the job site early or miss a day of work. Would that individual be able to maintain employment?
>
> A. No, sir. They might be able to get a job, but they would have serious difficulty maintaining employment with that – those sorts of conditions.[32]

***Findings and Conclusion***

1. **Appeals Council's Decision**

Prince alleges that the Appeals Council failed to properly assess her arguments raised in her brief requesting review, and accordingly the Council failed to follow its own policy and

---

[30] Tr. 40-42.

[31] Tr. 42.

[32] Tr. 46.

procedure. The brief submitted to the Appeals Council raised similar arguments to those raised by Prince in the instant case.

Under Section I-3-5-90 of the Appeals Council's own internal procedures, published in the *Hearings, Appeals and Litigation Law Manual* ("HALLEX manual"), the Council does not have to specifically address additional evidence or legal arguments submitted in connection with a request for review. However, the evidence and briefs must be identified and/or acknowledged.[33] Although there is a split in the circuits regarding the legal effect of HALLEX, the Fifth Circuit has concluded that violations of HALLEX can be grounds for granting relief:

> While HALLEX does not carry the authority of law, this court has held that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir.1981). If prejudice results from a violation, the result cannot stand. *Id.*

Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000).[34] The Newton court found that the Council violated its own internal procedures. Id. at 459. The court in Newton determined, however, that the additional evidence was not relevant to the claim for benefits, and, consequently, held that the Appeals Council's failure to specifically address the evidence was not grounds for relief. Id. at 459-60.

In the instant case, the Appeals Council did not specifically identify or acknowledge Prince's brief filed with the Appeals Council on April 2, 2004, but rather stated, "In looking at

---

[33] The HALLEX manual was created by the Social Security Administration to "convey guiding principles, procedural guidance and information" to the staff of the Social Security Administration's Office of Hearings and Appeals. *See* Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000).

[34] In contrast, see Moore v. Apfel, 216 F.3d 864, 868-69 (9th Cir. 2000) (finding that HALLEX is an internal manual with no legal force); and Tineo ex rel Tineo v. Barnhart, 2002 WL 31163889, *3 (S.D.N.Y.2002) (noting the split in the circuits, but declining to reach the question of whether HALLEX provides an independent source of the Commissioner's duties to applicants or otherwise decide its legal authority).

your case, we considered the reasons you disagree with the decision."[35] Since the brief is not included in the administrative record, it is unclear whether or not the Appeals Council considered plaintiff's brief. Based on the procedures for denial of requests for review, it appears that the Appeals Council violated its own internal procedures in not identifying or acknowledging Prince's brief. Furthermore, since, as addressed below, the undersigned concludes that the errors identified by Prince are meritorious, it follows that she was prejudiced by the Appeals Council's failure to consider those same arguments, which resulted in her having to file a federal civil action.

2. **Severity of impairments**

Prince argues that the ALJ failed to consider the severity of all of her impairments.

The Fifth Circuit uses the following standard in determining whether a claimant's impairment is severe: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985), citing Estran v. Heckler, 745 F.2d 340, 341 (5th Cir.1984). See also Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984); Martin v. Heckler, 748 F.2d 1027, 1032 (5th Cir.1984); Davis v. Heckler, 748 F.2d 293, 296 (5th Cir.1984).

In the case at bar, at Step 2, the ALJ assessed the medical evidence. However, the assessment does not provide adequate information regarding Prince's condition. Most notably is that the ALJ does not discuss Prince's repeated hospital treatment for nausea, vomiting, and

---

[35] Tr. 4.

weight loss. Although Prince was hospitalized four times in two years, the ALJ noted only one hospitalization:

> In November, 2002, the claimant entered Our Lady of Lourdes Hospital. She had experienced an acute episode of nausea and vomiting and coffee-ground hematemesis, which were suggestive of gastritis. She was treated appropriately. On improvement, she was discharged home.[36]

The ALJ completely ignored the fact that Prince's gastric problems were ongoing, and required frequent trips to the hospital and doctor. Likewise, the ALJ did not discuss the fact that Prince was diagnosed with diabetic neuropathy in her feet, which causes numbness.

Considering that neuropathy and repeated hospitalizations for vomiting, nausea, and weight loss would interfere with her ability to work, the undersigned finds that the ALJ's failure to find Prince's gastric problems and neuropathy "severe" impairments was erroneous.

### 3. Residual functional capacity and disability determination

Prince maintains that because of the erroneous severity assessment, the ALJ erred in the remaining steps of the evaluation.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity, and he must explain his decision. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). In the instant case, the ALJ failed to address the effect of Prince's repeated bouts with nausea, vomiting, and diarrhea on her ability to work.

More importantly, the ALJ failed to consider whether Prince could maintain a job with her impairments. In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

---

[36] Tr. 14.

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id. (citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

Prince's diabetes and depression affect her ability to deal with stress. She also has vision problems which limit her ability to drive or operate hazardous machinery. Further, Prince was hospitalized repeatedly for vomiting, diarrhea, and nausea. The hospital records note that Prince had had vomiting, nausea and/or diarrhea for days and sometimes weeks prior to arriving at the hospital. By the time she was hospitalized she was sometimes dehydrated. Her hospitalizations were for at least two days each time. It appears extremely unlikely that Prince, with diabetes, depression, poor vision, and chronic gastric problems, would be able to perform the required physical acts day in and day out in a realistic work setting.

Additionally, when questioned about employment for an individual who had bouts of vomiting, nausea, and diarrhea that often required missing work, the vocational expert stated that although such a person may be able to obtain employment, she would not be able to maintain it. Accordingly, since Prince's gastric problems necessarily require either repeated breaks while on the job or absences from work for hospitalizations, she would not be able to maintain employment. Considering the foregoing, the undersigned concludes that the ALJ erred in finding that Prince's could perform substantial gainful employment.

## *Conclusion*

Considering the foregoing, the Commissioner's decision is **REVERSED** and Prince is awarded supplemental security income consistent with an onset date of January 1, 2001.[1]

Signed at Lafayette, Louisiana on October 20, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[1] This constitutes a "final judgment" that triggers the filing period for an EAJA fee application. Shalala v. Schaeffer, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); Freeman v. Shalala, 2 F.3d 552 (5th Cir. 1993).